**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CARD ACTIVATION TECHNOLOGIES, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 06 C 5578** |
| | ) | |
| **v.** | ) | **Magistrate Judge Maria Valdez** |
| | ) | |
| **WALGREEN CO.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

<u>**REPORT AND RECOMMENDATION**</u>

MARIA VALDEZ, Magistrate Judge.


Plaintiff Card Activation Technologies, Inc. ("Card Activation") brought this suit against Walgreen Co. pursuant to 35 U.S.C. § 271, claiming that Walgreen has infringed U.S. Patent No. 6,032,859  (the '859 patent), which is owned by Card Activation.  The District Court referred the matter to this Court for a hearing and a report and recommendation on claim construction.  The parties submitted opening, responsive, and supplemental claim construction briefs, and the Court held a claim construction hearing on April 4, 2008.


<u>**DISCUSSION**</u>

**I.**   <u>**Background**</u>

The '859 patent, entitled Method for Processing Debit Purchase Transactions Using a Counter-Top Terminal System, issued March 7, 2000.  It is a method patent relating to a method for processing transactions of various debit styled cards of the type sold by retail establishments.  The

claims of the '859 patent cover three types of transactions using these debit styled cards:  a purchase transaction; a transaction where value is added to either a central database or to the card itself, increasing the purchasing value of the card; or the activation of a phone card.  A card is activated by magnetically coding the card with certain relevant information including an intrinsic monetary value.  In the alternative, the value of the card may be stored in a designated database separate from the card itself.  The card can be used instead of cash by presentment at a retail establishment.

The patent also discloses the processing of these types of cards.  The patent's claims provide that the three types of transactions using debit styled cards are processed using a countertop terminal.  The equipment used to carry out the method of the invention includes the main terminal unit with an alphanumeric display, a keypad for entry of a personal identification number plus programmable function keys, and a swipe reader for reading cards.  The retailer's processing equipment determines the amount of a purchase, then contacts the debit card owner's host account to determine whether sufficient funds are available in the account to cover the particular purchase.  If there are sufficient funds, the debit card owner's host communicates that fact to the retail establishment and debits the value of the card accordingly.

As an example of use, a customer will take a product to the sales counter for purchase, then provide input, such as swiping the card through the card reader of the terminal unit.  The terminal unit's display will prompt the user to enter a PIN, which is entered by the customer.  The clerk will enter the amount for a given transaction, the customer will be given the opportunity to confirm it, and the terminal unit will then dial the electronic debit processor, transmit the transaction, and upon approval print the receipt.  During the course of processing by the retailer, the card's coding is

2

changed by deducting the amount of money programmed on the card, or programmed in the database, by the amount of the purchase.

The method of the '859 patent related to transactions adding value to a debit styled card involves a customer requesting an increase in value and tendering an appropriate amount of money to a clerk. The clerk then will enter data related to the increase in value, and the amount of the increase in value is sent to the host data processor. A response is received from the host increasing the purchasing value of the card. The method of the patent related to phone card activation involves transmitting an activating request for a phone card and transmitting encrypted phone card data to a host data processor. The encrypted approval data is then received from the host data processor and the phone card is enabled.

## II.    <u>Legal Standard</u>

Claim construction is the first step in determining whether a patent is infringed. In the claim construction phase, which is a matter of law to be determined exclusively by the court, the court interprets the claims of a patent, defining the scope of the patentee's rights under the patent. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995). In the second phase, the factfinder compares the construed claims to the accused device to determine whether all of the claim limitations exist in the accused device. *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998).

In construing claims, a court is not required to determine the meaning of every aspect of the patent claims. Rather, "[c]laim construction is a matter of resolution of *disputed* meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." *NTP v. Research in Motion*, 418 F.3d

3

1282, 1311 (Fed. Cir. 2005) (quoting *U.S. Surgical Corp. v. Ethicon, Inc.,* 103 F.3d 1554, 1568 (Fed. Cir. 1997)) (emphasis added).

The most important source for claim construction is intrinsic evidence. *V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1310 (Fed. Cir. 2005). Intrinsic evidence includes the language of the claims to be construed, the patent's other claims, the remainder of the patent document, the prosecution history, and any prior art cited in the prosecution history. *Id.* at 1311.

Courts are directed to begin their analysis by looking to the claim language itself. *See Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1304 (Fed. Cir. 2001); *Hockerson-Halberstadt, Inc. v. Avia Group, Int'l, Inc.*, 222 F.3d 951, 955 (Fed. Cir. 2000); *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) ("It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'") (citation omitted); *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003) (stating that courts "engage in a 'heavy presumption' that claim terms carry their ordinary meaning as viewed by one of ordinary skill in the art"). The usage and context of a disputed claim term has been called "the most important indicator of the meaning" of the term. *See Middleton, Inc. v. Minn. Mining & Mfg. Co.*, 311 F.3d 1384, 1387 (Fed. Cir. 2002). The default meaning of a claim term is its ordinary and customary meaning, which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312-13; *see also Altiris*, 318 F.3d at 1369 ("[D]ictionary definitions may be consulted in establishing a claim term's ordinary meaning.").

Other than the claim language, the specification is the most important type of intrinsic evidence. *See Phillips*, 415 F.3d at 1315 (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576,

4

1582 (Fed. Cir. 1996)) (stating that the specification "'is always highly relevant to the claim construction analysis . . . it is the single best guide to the meaning of a disputed term'"); *Merck & Co. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003) (explaining that a patent's claims "must be construed so as to be consistent with the specification"); *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("'[T]he interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim.'") (quoting *Renishaw PLC v. Marposs SpA*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

The written description does not limit the scope of the invention as described in the patent claim, because it sometimes describes just one way of practicing the invention, the "preferred embodiment." *See Phillips*, 415 F.3d at 1323; 35 U.S.C. § 112. A patentee does not need to put every possible embodiment of the invention into the written description section. *See Sunrace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1305 (Fed. Cir. 2003). Accordingly, it is not proper for a court to "import[ ] limitations from the specification into the claims absent a clear disclaimer of claim scope." *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1373 (Fed. Cir. 2007). A court should not limit claims from the specification unless there is "a clear disclosure that the patentee intended the claims to be limited as shown." *MBO Labs., Inc. v. Becton Dickinson & Co.*, 474 F.3d 1323, 1334 (Fed. Cir. 2007); *see Phillips*, 415 F.3d at 1323; *Renishaw PLC*, 158 F.3d at 1250 ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.").

Other claims in a patent may also assist a court in construing a particular claim's terms. *See Vitronics Corp.*, 90 F.3d at 1582. "Because claim terms are normally used consistently throughout

5

the patent, the usage of a term in one claim can often eliminate the meaning of the same term in other claims." *Phillips*, 415 F.3d at 1314. Moreover, a court should presume that limitations in a dependent claim are not present in the corresponding independent claim. *See id.* at 1314-15. Another interpretation tool is the doctrine of claims differentiation, which "is based upon 'the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope.'" *Andersen Corp.*, 474 F.3d at 1369 (citation omitted). "'To the extent that the absence of such difference in meaning and scope would make a claim superfluous, the doctrine of claim differentiation states the presumption that the difference between claims is significant.'" *Id.* at 1369 (quoting *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987)). Another part of the intrinsic record to which a court may refer is the prosecution history, if it is in evidence, which can show the court "how the inventor understood the invention the invention in the course of prosecution, making the claim scope narrower than it would be otherwise." *Phillips*, 415 F.3d at 1317.

Courts are also authorized to consider extrinsic evidence, which "'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" *Id.* at 1317 (quoting *Markman,* 52 F.3d at 980). Extrinsic evidence, however, is considered less significant than the intrinsic record in determining a claim's meaning, and it therefore must be considered in the context of the intrinsic evidence. *See C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004); *Phillips*, 415 F.3d at 1319. In addition, because flaws are inherent in each type of extrinsic evidence, courts must assess that evidence accordingly. *See Phillips*, 415 F.3d at 1319.

Expert testimony about the meaning of claim terms may be used "only to help the court come to the proper understanding of the claims" and "may not be used to vary or contradict the claim language" or to "contradict the import of other parts of the specification." *Vitronics Corp.*, 90 F.3d at 1584. The Federal Circuit has approved the use of expert testimony to explain how persons working in a relevant technological field would understand the meaning of terms used in the patent. *See Merck & Co.*, 347 F.3d at 1372; *Altiris*, 318 F.3d at 1369; *see also Phillips*, 415 F.3d at 1318 ("[E]xpert testimony can be useful to a court . . . to provide background on the technology at issue, to explain how an invention works, to ensure . . . the court's understanding of the technical aspects of the patent . . ., or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field."). However, expert testimony that is "conclusory" is "not useful to a court," nor should a court rely on expert testimony that contradicts the intrinsic evidence. *See Phillips*, 415 F.3d at 1318; *Altiris*, 318 F.3d at 1369.

## III.   Disputed Terms

The '859 patent contains a total of thirty-eight claims, four independent (1, 10, 20, and 29) and the rest dependent. During claim construction briefing, the parties agreed that the remaining claims at issue are all four independent claims and dependent claims 5, 11, 16, 21, 24, 30, 32, and 35.

### A.   *Means-Plus-Function*

Defendant first argues that the "telecommunications means" described in the method claims requires a means-plus-function analysis as described in 35 U.S.C. § 112, ¶ 6:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6.

Defendant contends that the patent is invalid for failing to disclose any structure for performing the telecommunications function. The Federal Circuit has provided district courts with guidance as to (1) when a particular term falls within the scope of this paragraph, and (2) how to construe a term once it has been determined to be a "means-plus-function" term. When a limitation uses the language "means . . . for" performing a particular function, that invokes a rebuttable presumption that the claim limitation is governed by 35 U.S.C. § 112, ¶ 6. *See Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1361 (Fed. Cir. 2004). This presumption, however, may be overcome if the claim also recites "the structure needed to perform the recited function." *TI Group Auto. Sys. (N. Am.), Inc. v. VDO N. Am., L.L.C.*, 375 F.3d 1126, 1135 (Fed. Cir. 2004) (holding that a claim limitation reciting a "pumping means" did not invoke the paragraph where the limitation also recited the pump's structure, location, and operation); *see also Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 194 F.3d 1250, 1257 (Fed. Cir. 1999) ("Th[e] presumption collapses . . . if the claim itself recites sufficient structure, material, or acts should perform the claim function."). Conversely, the fact that "an element does *not* include the word 'means' does not automatically prevent that element from being construed as a means-plus-function element." *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 531 (Fed. Cir. 1996) (emphasis in original).

When construing a claim limitation governed by 35 U.S.C. § 112, ¶ 6, a court must first identify the recited function within the limitation. *See Gemstar-TV Guide Int'l, Inc.*, 383 F.3d at 1361 ("We consult the claim language to determine the function of the limitation."). After determining the limitation's function, the court then "consult[s] the written description to determine the corresponding structure necessary to accomplish the stated function." *Id.* "Identification of

8

corresponding structure may embrace more than the preferred embodiment. A means-plus-function claim encompasses all structure and the specification corresponding to that element and equivalent structures." *Micro Chem., Inc.*, 194 F.3d at 1258; *see TI Group Auto. Sys. (N. Am.), Inc.*, 375 F.3d at 1137 ("When multiple embodiments in the specification correspond to the claimed function, proper application of § 112, paragraph 6 reads the claim element to embrace each of those embodiments.") (citation and internal quotation omitted).

However, a court's construction should not "include[ ] elements that are not necessary for performing the recited function." *TI Group Auto. Sys. (N. Am.), Inc.*, 375 F.3d at 1135. "The statute does not permit limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claim. Nor does the statute permit incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem., Inc.*, 194 F.3d at 1258.

In this case, the claims' use of the term "means" invokes a rebuttable presumption that it is a means-plus-function term governed by 35 U.S.C. § 112, ¶ 6. Plaintiff argues, however, that the presumption is overcome because one skilled in the relevant art would understand that the means itself connotes structure. Moreover, the claims add other details to the structure, *i.e.*, the patent teaches that the desktop terminal is connected via a modem line to a host computer, (Column 5, lines 53-60); that the terminal "calls" a host, (Column 5, lines 18-24; Column 6, lines 41-45); and that the terminal "dials" the electronic debit processor, (Column 3, lines 37-41). In support of its argument, Plaintiff offers the declaration of Jack Grimes, a person skilled in the relevant art.[1] Grimes opines

---

[1] Grimes earned B.S. and M.S. degrees in Electrical Engineering and a Ph.D. in Electrical Engineering (with a minor in Computer Science), all from Iowa State University. Grimes has worked in the computer field for over 35 years and claims extensive practical experience in payment systems and their development, and he has participated in and directed commercial payment card projects. He has been active in several professional societies and has published

that the term "telecommunication means" calls to mind at least the structure of a modem to a person of ordinary skill in the relevant art in 1996 and for at least ten years prior. (Pl.'s Resp., Grimes Decl. ¶ 21.) Grimes further declares that one skilled in the relevant art would understand the specification's description of the terminal unit "dialing" or "calling" an electronic debit processor or host computer to mean that a modem would be the interface device that dials or calls, using a conventional telephone line to allow a counter-top terminal to communicate with a host computer. (*Id.* ¶ 17.) Based upon the unchallenged declaration demonstrating that the term "telecommunications means" connotes a particular structure to one skilled in the relevant art, the Court agrees with Plaintiff that the term "telecommunications means" is not a means-plus-function term. Although Defendant conclusorily asserts that the term "telecommunications" refers only to a function, Defendant does not offer any proof that the corresponding structure would not be understood by one of ordinary skill in the relevant art.

**B.** ***Timing of the Steps in the Claims***

Defendant asserts that the steps in the method claims, *i.e.*, Claims 1, 10, 20, and 29, must be performed in the order set forth in the claims.[2] Plaintiff responds that, while certain steps must be performed before other steps, all of the steps in the method claims do not need to be performed in the precise order recited in the claims.

"Unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one. . . . However, such a result can ensue when the method steps implicitly require that they be performed in the order written." *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d

---

over 40 conference and journal papers and has made hundreds of technical presentations around the world on computer technology. (Pl.'s Resp., Grimes Decl. ¶¶ 5-6.)

[2] The full text of the method claims is set forth at the end of the Report and Recommendation.

10

1323, 1342 (Fed. Cir. 2001) (citation omitted). In determining whether a method claim's steps must be performed in order, a court must first "look to the claim language to determine if, as a matter of logic or grammar, they must be performed in the order written." *Altiris*, 318 F.3d at 1369; *see also Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.*, 152 F.3d 1368, 1376 (Fed. Cir. 1998) (holding that "the sequential nature of the claim steps is apparent from the plain meaning of the claim language and nothing in the written description suggests otherwise"). If the limitation is not so apparent, the court should then "look to the rest of the specification to determine whether *it* 'directly or implicitly requires such a narrow construction.'" *Altiris*, 318 F.3d at 1370 (quoting *Interactive Gift Express, Inc.*, 256 F.3d at 1342) (emphasis in original). If it does not, the claim's sequence of steps is not required. *Id.* The general principles governing the use of the rest of the specification in claim construction apply when the limitation is the order of method steps, rather than a limitation on a particular claim term. *Altiris*, 318 F.3d at 1370.

Defendant states that the steps must logically be performed in the order recited. For example, Claim 1's first step is "providing a counter-top terminal having telecommunications means operable with a computer," a keypad, a display, and a card reader. The next step is "entering transaction data to the computer through keypad data entry." Therefore, according to Defendant, the second step cannot be performed until after the computer and keypad have been "provided" in step one.

Plaintiff maintains that, although several steps must logically be performed before other steps, certain steps are capable of being performed in any order. In support of its claim, Plaintiff presents another declaration of Jack Grimes. According to Grimes, there were several manufacturers of terminals at the time of the patent, and each offered many different terminals for processing sales

11

transactions. Plaintiff argues that one of ordinary skill in the art would know that these different terminals would vary in their sequence of operations, but certain operations would need to be conducted in a particular order, *i.e.*, sending information related to a transaction to a host computer is one of the last operations.

Plaintiff also contends that the opening paragraph of the Detailed Description in Column 2, lines 43-51, supports its argument regarding the timing of the steps, where it states that the "embodiments are provided so that this disclosure will be thorough and complete, and will fully convey the scope of the invention to those skilled in the art." Plaintiff offers two examples of embodiments with differing sequences, one in which the card is swiped before the amount is entered (Column 3, lines 25-41), and another in which the purchase is made and then the card is swiped, just before the host is called, (Column 5, lines 53-58).

According to Grimes, the interdependencies of the steps of Claim 1[3] is as follows:

Step 1a must occur first
Steps 1b or 1c or 1e may occur after step 1a in any order
Step 1d must follow step 1c
Steps 1f, 1g, and 1h must occur last, in the order listed.

(*See* Pl.'s Initial Mem., Ex. D at 4.)

The Court concludes that, based on the plain language of the method claims and without relying upon the Grimes declaration, the steps do not need to be performed in the precise order recited. While Defendant is correct in noting that step 1b logically follows step 1a, that does not require the further conclusion that all steps must be performed in the recited order. Upon reading the plain language of the steps, it is clear that all steps other than step 1a must follow step 1a, as they

---

[3] His analysis of the interdependencies of the other independent claims is essentially the same as that of Claim 1.

reference the equipment provided in that step. Similarly, the final three steps, which involve transmitting a transaction request and receiving and displaying a response from the host computer, must logically follow steps 1b, 1c, 1d, and 1e, which relate to inputting transaction data or an authorization to initiate a transaction. However, steps 1b, 1c, and 1e do not reference any steps other than step 1a, and nothing in the language of the claim would prevent them from being performed in a different sequence. *See Altiris*, 318 F.3d at 1370 (stating that there is no statement in the description indicating that the order is important, no disclaimer of any other order of steps, and no prosecution history suggesting a surrender of any other order). The Court therefore recommends that the timing of the steps of the method claims be construed in a manner consistent with their plain language and that every step need not be performed in the precise manner recited in the claims.

C. ***"Providing a counter top terminal having telecommunication means operable with a computer, at least one keypad for data entry to the computer, a display responsive to the computer, and a card reader communicating with the computer" [Claims 1, 10, 20, 29]***

Plaintiff argues the ordinary meaning of the term is providing ("supplying for use") a counter top terminal that contains a telecommunication means operable ("capable of being used") with a computer, at least one keypad for data entry to the computer, a display responsive to the computer ("performing its function automatically under the control of the computer"), and a card reader communicating ("sending or receiving information") with the computer.

Defendant states that "[i]nterpreting the 'providing' clause in light of the specification requires that it be interpreted to mean that the countertop terminal with the associated keypad display and card reader be ready for use," *i.e.*, "the 'providing clause' requires that the equipment be in position, turned on and enabled and ready to process a card." According to Plaintiff, the claim's plain language does not require that the countertop terminal be turned on, enabled, and ready

13

to process a card. The Court finds that Plaintiff's disagreement with this limitation is inconsistent with its own proposed construction, which is that a terminal is "supplied for use" with a telecommunications means that is "capable of being used," a display that "performs its function automatically under the control of the computer," as well as a card reader "sending or receiving information." A plain reading of this language requires a construction that the terminal is active and ready for use.

###   D.      *"Purchasing value of a card in response to card use" [Claims 11, 30]*

Plaintiff states that this term means "a value in a central data base identified by the card (for magnetic stripe cards) or stored on the card (for chip cards)." Defendant proposes a construction by which the claim requires the card reader to "serve the function of 'modifying' the 'purchasing value' of a card, and that, when interpreted in light of the specification, must be construed to modify information contained on the card." Defendant states that the only disclosure of "modifying" a card is in connection with phone and gift cards, in which the information is contained on the card or on a separate database.

Plaintiff argues that the plain and ordinary meaning of the claim is that a card can be used for purchases and has a certain value, and when it is used for purchases, its value goes down by the amount of the purchase. According to Plaintiff, the specification also supports its reading. The specification provides, among other things, that "[t]he host keeps a record of the account balances. Alternatively in applications using smart cards (chip cards), the balance is kept on the card and the terminal will call the host only in batch mode to transfer all collected activity rather than for each individual transaction," (Column 5, lines 28-32); after a customer makes a purchase using a prepaid card, "the host computer . . . would deduct the purchase from the balance and keep a running total,"

(Column 5, lines 54-59); and the host "deducts current purchase and sends back balance remaining which is printed on customer receipt," (Column 5, lines 41-46).

Plaintiff also argues that its interpretation is consistent with the patent's other claims, namely independent claims 1, 10, 20, and 29, which provide for the step of entering a code for "access to a customer data base of a host computer" and another step of transmitting a transaction request to a host data processor "for requesting a response of approval or disapproval from the host data processor." Pursuant to the parties' agreed interpretation of the clause of requesting an approval from the host data processor, the host data processor checks the customer data base to determine whether there are funds available in the customer data base to cover the transaction. Plaintiff argues that this agreed interpretation is not consistent with Defendant's proposed interpretation of the present term, which by implication eliminates any value reflected in a database.

The Court finds that Defendant's proposed construction is not apparent from the plain language of the claims, and its broad citation to two full columns in the specification (without pinpoint line citations) in support of its argument is not sufficient to persuade the Court to adopt its construction. Therefore, the Court recommends that Plaintiff's construction of the term "purchasing value of a card in response to card use" be adopted.

### E. *"Transaction data" [Claims 1, 10] and "sales transaction data" [Claims 20, 29]*

Plaintiff states that "transaction data" means "information associated with a transaction" and "sales transaction data" to mean "information associated with a sales transaction." Defendant interprets the term "sales transaction data" as necessarily including the price paid for goods or services; otherwise, the customer's authorization would be meaningless. According to Defendant,

15

both claim terms refer to "information relating to purchases, including such things as pricing information, the nature of goods, etc."

Plaintiff states that the term "transaction data" does not limit itself to information regarding a "purchase" and that the specification does not limit or expand the plain and ordinary meaning of the phrase "transaction data." Plaintiff also contends that Defendant erroneously attempts to define the two terms in the same manner, as the term "transaction data," found in claims 1 and 10, is distinguished from the term "sales transaction data," found in claims 20 and 29. Plaintiff argues that the term "sales" modifies and narrows the broader phrase "transaction data," but it does not require than an interpretation of "sales transaction data" include pricing information, the nature of goods, etc.

The Court agrees with Plaintiff that, to the extent Defendant construes the separate terms "transaction data" and "sales transaction data" identically, such a construction is inconsistent with the plain language of the claims. The Court recommends that Plaintiff's proposed construction of the term "transaction data" be adopted. For the term "sales transaction data," the Court agrees with Defendant that, consistent with the specification, (*see, e.g.,* Column 3, lines 35-37), and the context of Claims 20 and 29, the definition of the term should include a reference to the amount of the transaction. The Court therefore recommends that the District Court construe the term "sales transaction data" as "information associated with a sales transaction, including but not limited to pricing information."

### F.    *"Debit styled card" [Claims 1, 10, 20, 29]*

Plaintiff's interpretation of the term "debit styled card" is "a card having a value in a central data base identified by the card (for magnetic stripe cards) or stored on the card (for chip cards)."

16

According to Defendant, the term should include "any card against which a charge is incurred, that would include not only a 'debit card,' such as a gift card or a phone card, but a credit card as well." The parties thus disagree on whether the term should include credit cards.

Plaintiff states that the independent claims of the patent all claim a "debit styled card" where money is immediately withdrawn from a central account or from the card itself, as opposed to a credit card, which is a card that assures a retailer that the card holder has sufficient credit and that the issuer will pay for the merchandise at issue. The specification provides that, among other things, "[t]he [debit-styled] card has intrinsic value which is debited every time a purchase is made," (Column 5, lines 17-18); the value of the card "is reduced as purchases are made," (Column 5, lines 50-52); and the value of the card can be increased "once the balance is depleted or is insufficient for the purchase," (Column 5, lines 28-32). Plaintiff also argues that its proposed interpretation of the term is consistent with the proper interpretation of the phrase "purchasing value of a card."

Defendant maintains that the processing of debit cards is at best a preferred embodiment and that nothing in the claims or specification limits "debit styled cards" to debit cards alone. Defendant argues that a claim's preamble merely recites an intended use and does not limit the claim where, as in this case, the preamble does not provide antecedents for claim terms appearing later in the claims. *See Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1345 (Fed. Cir. 2003). Defendant states that, for example, Claim 1's preamble refers to "debit purchase transactions," while the method step constituting a limitation refers to a "debit styled card," demonstrating that the preamble provides no antecedent for a "debit styled card" and thus is not a limitation of the claims.

17

Defendant also contends that the specification is not consistent with Plaintiff's construction that the claims are limited to debit cards. The Summary of the Invention states:

> In view of the foregoing background, it is therefore an object of the present invention to provide a counter-top credit and ATM transaction card terminal for the purchase of goods and services. It is further an object to provide capability for phone card activation, customer frequency programs, check guarantee and prepaid cellular time activation.
>
> * * * *
> Processing services to merchants will allow them to accept all credit and ATM cards for the purchase of goods or services provided by that particular location.

(Column 1, lines 54-60; Column 2, lines 7-9.)

In light of the specification language summarizing the invention, the Court agrees with Defendant's proposed construction that the term "debit styled cards" may include credit cards as well as a gift card or phone card. *See C.R. Bard*, 388 F.3d at 864 ("Statements that describe the invention as a whole, rather than statements that describe only preferred embodiments, are more likely to support a limiting definition of a claim term.").

G.    *"Entering a customer authorization code" [Claims 1, 10, 21, 32]*

The parties do not dispute that the term "customer" should be given its ordinary meaning, that the term "code" means "a sequence of letters or numbers or a combination thereof," and that "authorization" means "approval by an entity with authority for approval." Plaintiff states that the step of "entering a customer authorization code" means "a code, a code being a series of letters or numbers or a combination thereof, signifying customer approval." Defendant argues that a "'customer authorization code' should be construed as a series of letters or numbers or a combination thereof known to the customer making the purchase which is entered into the computer

to authorize access to the customer data base." The parties therefore disagree on whether the code must be known to the customer.

Plaintiff argues that the claim language does not state that the customer must know the exact digits comprising a code, and thus the plain and ordinary meaning of the words does not support Defendant's proposed construction. According to Plaintiff, the patent specification does not clearly disclaim the scope of the plain claim language. First, the specification does not provide that the code is known to the customer. The specification indicates that a code may be entered by swiping a card, scanning a bar code, entering an identification number on a keypad, or other equivalent means. In addition, the specification provides that the authorization code may be encrypted on a card, so the code may not even be apparent to the customer. Second, Plaintiff contends that the file history supports this reading. The examiner originally rejected the claim on the basis that another patent taught entering an authorization code through a keypad, in which case the code would be known to the customer. Plaintiff also maintains that Defendant's proposed interpretation is inconsistent with its own interpretations of other claims in this case. For example, in relation to claim 20, Defendant's proposed interpretation does not provide that the person "entering an authorization code through the keypad for having the computer initiate communication with a host data processor" must know the code.

Defendant argues that because the customer authorization code signifies approval, the code must be known to the customer. But Defendant acknowledges that in certain circumstances, a customer may signify approval by swiping a card. Defendant attempts to work around this specification by stating that the customer must at least have "sufficient control" over the code that entry of the code signifies approval and that it is "known" to the customer "in that its use is under

the customer's control." Defendant's interpretation of the term "customer authorization code" does not support the proposed limitation that the code be "known" to the customer. Defendant's apparent concern that a customer's approval may not be given unless the customer knows the code is not well founded. Plaintiff's own construction requires that the code be used to signify approval; it is not an additional requirement of the claim that the precise code signifying the approval be known. The Court therefore recommends that the term be construed consistent with its ordinary meaning and without the requirement that the code be known to the customer.

   **H.**   ***"Entry of a clerk authorization code for initiating a debit purchase transaction"
             [Claims 1, 10, 21]***

Plaintiff defines a clerk authorization code as a code, a series of numbers or letters or combination thereof, identifying a clerk. Plaintiff reads the claim as not requiring that the clerk authorization code be entered through the keypad, or that the code be entered for each transaction.

Defendant interprets the claim term as "[e]ntering, through the keypad, a code known to the store clerk entered for each transaction to enable information respecting the sale to be transmitted to the data processing computer for the purpose of initiating the transaction. In other words, the 'clerk authorization code' is a code which tells the system that the transaction information can be forwarded to the computer for processing." The parties therefore disagree on whether the clerk authorization code must be known to the clerk and whether it must be entered for each transaction.

In support of its argument that the code must be known to the clerk, Defendant states that the specification provides that the only way the code can be input is through the keypad, and thus the code must be known. Plaintiff responds that Defendant's interpretation is inconsistent with the specification, which provides that for cellular phone activation, "the user, provides input . . . by swiping an ID card . . . or in an alternative, enters the ID number on the keypad." (Column 4, lines

20

59-64.)  Plaintiff also cites to the specification's declaration that "[t]he code . . . serves to authenticate the source of the message so that . . . unauthorized persons can not steal service by *entering* false messages into the system." (Column 4, lines 35-39 (Plaintiff's emphasis).)  Plaintiff's arguments are unpersuasive.  First, the cited portion of the specification describing "swiping an ID card" relates to cellular phone activation transaction, not "for initiating a debit purchase transaction" as described in the claim.  Second, assuming this part of the specification is relevant to a debit purchase transaction, the language following the quoted portion makes it clear that the "user [who] provides input . . . by swiping" is the customer, not the clerk: "The user makes the selection, the clerk is prompted to collect the amount and confirm it by entering an authorization code on the remote keypad."  (Column 4, line 66-Column 5, line 1.)  Plaintiff has therefore offered no basis to conclude that the authorization code entered by the clerk can be entered other than on the keypad provided in the method claims.

Defendant next argues that the wording of the claims demonstrates that separate entry of a code is required for each transaction, *i.e.*, each time a debit purchase transaction is initiated and the data associated with a transaction is authorized to be released, a clerk authorization code must be entered.  Plaintiff argues that a code identifying a clerk is sufficient and that the word "a" in the phrases "a clerk authorization code" and "a debit purchase transaction" should be read as "one or more," meaning that a clerk need not enter a code for each separate transaction.  Defendant responds that Plaintiff's proposed construction disregards the purpose of the clerk authorization code, which is "initiating" and "authorizing" the transaction, not identifying a particular clerk.

The Federal Circuit "has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional

phrase 'comprising.'" *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) ("Unless the claim is specific as to the number of elements, the article 'a' receives a singular interpretation only in rare circumstances when the patentee evinces a clear intent to so limit the article."); *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001) ("In the parlance of patent law, the transition 'comprising' creates a presumption that the recited elements are only a part of the device, that the claim does not exclude additional, unrecited elements.").

In this case, the claims do contain the transitional phrase "comprising," and therefore Plaintiff has met the presumption that the indefinite article "a" means "one or more." Moreover, Defendant has not made a showing that this is one of the "rare circumstances" in which the patentee has evinced a clear intent to limit the article. Thus, while Defendant's "common sense" reading of the claims may be logically compelling, Defendant has offered no case law that allows it to overcome the presumption.

## I. *"Entering an authorization code through the keypad for having the computer initiate communication with a host data processor" [Claims 20, 29]*

Plaintiff argues that the authorization code referred to in the claims may be entered by any person. In its initial claims construction brief, Defendant disavowed its preliminary construction that "[t]he 'customer authorization code' must be construed as a series of letters or numbers or a combination thereof known to the customer making the purchase which is entered into the computer for each transaction to permit or enable communication with the host data processor" to the extent that it required the customer to know the authorization code. Defendant's remaining argument relating to this phrase was whether the authorization code needed to be entered for each transaction, which was discussed above in section 3.H. The Court therefore recommends that the claim be

construed according to its plain meaning, without the additional limitation that the code be entered by any particular person.

**J.** **_"Requesting a credit increase for use with the debit card" and "increasing the value of the debit card by the credit amount" [Claims 5, 16, 24, 35]_**

Plaintiff interprets these claims to mean that the value of a card may be modified in a central database identified by the card (for magnetic stripe cards) or in the card (for chip cards). Defendant urges a construction that, by "providing information sufficient to increase the value of a debit card to increase its purchasing power," the step "seeks modification of information contained on the debit card reflecting a higher monetary value"; or modification of "the information contained on the card to reflect the amount referred to as the 'credit amount' or the money paid for the phone card." Defendant therefore seeks to limit the terms to a value on the card itself, as opposed to a value on an external database.

The Court agrees with Plaintiff that Defendant's limitation cannot be read into the claim. As explained in Defendant's own brief, the specification expressly states that "the value of the card may also be stored in a designated database separate from the card" and that after purchase, the amount may be deducted "from the amount originally programmed in the dedicated database." (Def.'s Br. on Claim Construction at 6 (citing Column 3, line 53 *et seq.*).) Nothing in the specification can be read to limit the claim as Defendant suggests. The Court recommends that the terms be interpreted as proposed by Plaintiff.

## CONCLUSION

For the reasons set forth above, the Court respectfully recommends that the disputed claim terms be construed in accordance with the conclusions set forth in this Report and Recommendation. Counsel has ten days from the date of service of this Court's Report and Recommendation to file

objections with the District Court.  *See* Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1).  Failure to object constitutes a waiver of the right to appeal.  *Lorentzen v. Anderson Pest Control,* 64 F.3d 327 (7th Cir. 1995).

**SO ORDERED.**

**ENTERED:**

**DATE:**   **September 09, 2009**
_____

_____

**HON. MARIA VALDEZ**
**United States Magistrate Judge**

## Claim 1

A method for processing debit purchase transactions, the method comprising the steps of:

> providing a counter-top terminal having telecommunications means operable with a computer, at least one keypad for data entry to the computer, a display responsive to the computer, and a card reader communicating with the computer for modifying purchasing value of a card in response to card use;

> entering transaction data into the computer through keypad data entry;

> reading a debit styled card through the reader for providing card data to the computer;

> entering a customer authorization code for authorizing access to a customer database of the host data processor;

> entering a clerk authorization code for initiating a debit purchase transaction;

> electronically transmitting a transaction request to the host data processor through the telecommunications means of the counter-top terminal for requesting a response of approval or disapproval from the host data processor;

> receiving a response from the host computer; and

> displaying the response from the host data processor for the debit purchase transaction on the counter-top terminal display.

## Claim 10

A method for processing debit purchase transactions, the method comprising the steps of:

> providing a counter-top terminal having telecommunications means operable with a computer, a keypad for data entry to the computer, an alphanumeric display responsive to the computer, and a card reader communicating with the computer;

> entering transaction data for a debit purchase transaction to the computer through keypad data entry;

> reading a debit styled card through the card reader for transferring card data to the computer;

> entering a customer authorization code for authorizing access to a customer database of the host data processor;

> entering a clerk authorization code for initiating a debit purchase transaction;

communicating with a host data processor through the telecommunications means of the counter-top terminal for requesting authorization of the debit purchase transaction;

requesting authorization of the debit purchase transaction from the host data computer; and

receiving the authorization.

## Claim 20

A method for processing debit process transactions, the method comprising the steps of:

providing a counter-top terminal having telecommunications means operable with a computer, at least one keypad for data entry to the computer, a display responsive to the computer, and a card reader communicating with the computer for modifying purchasing value of a card in response to card use;

entering sales transaction data to the computer through keypad data entry by a clerk;

entering confirmation of the sales transaction data by a customer;

reading a debit styled card through the card reader for providing card data to the computer;

entering an authorization code through the keypad for having the computer initiate communication with the host data processor;

electronically transmitting a transaction request to the host data processor through the telecommunications means of the counter-top terminal for requesting a response of approval or disapproval from the host data processor;

receiving a response from the host computer; and

displaying the response from the host data processor for the debit purchase transaction on the counter-top terminal display.

## Claim 29

A method for processing debit purchase transactions, the method comprising the steps of:

providing a counter-top terminal having telecommunications means operable with a computer, a keypad for data entry to the computer, an alphanumeric display responsive to the computer, and a card reader communicating with the computer;

entering sales transaction data by a clerk for a debit purchase transaction to the computer through keypad data entry;

entering confirmation of the sales transaction data by a customer;

26

reading a debit styled card through the card reader for transfering card data to the computer;

entering an authorization code through the keypad for having the computer initiate communication with the host data processor;

communicating with a host data processor through the telecommunications means of the counter-top terminal for requesting authorization of a debit purchase transaction;

requesting authorization of the debit purchase transaction from the host data processor; and

receiving the authorization.